*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY,

UNPUBLISHED
January 12, 2023

Plaintiff-Appellant,

v

No. 359401
Mackinac Circuit Court
LC No. 2017-008039-CE

ROBERT L. BROTHERTON,

Defendant-Appellee,

and

PETER COROGIN and DANA COROGIN,

Defendants.

Before: SHAPIRO, P.J., and BORRELLO and YATES, JJ.

PER CURIAM.

In this environmental dispute involving the alleged placing of fill material and improper construction of a logging road in wetlands, plaintiff Department of Environment, Great Lakes, and Energy[1] appeals as of right the trial court's judgment, following a bench trial, finding that one of the two sites involved was not a wetland and that the logging road constructed by defendant Robert Brotherton in the other site was exempt from the wetland permit requirement because it was a forest road that had minimal adverse impacts on the wetland. In challenging the trial court's decision, plaintiff also argues that the trial court erred in denying its earlier motion for partial summary disposition. For the reasons set forth in this opinion, we reverse the trial court's summary disposition ruling only with respect to the pole barn site, remand the matter for an entry of an order granting summary disposition in plaintiff's favor only with respect to Brotherton's violation of

---

[1] The Department of Environment, Great Lakes, and Energy (EGLE) was formerly the Michigan Department of Environmental Quality (DEQ).

-1-

MCL 324.30304 by his activities on the pole barn site, and affirm the trial court's ruling following the bench trial with respect to the logging road.

## I. BACKGROUND

This case arises from a dispute over whether Brotherton constructed a road in a wetland and placed additional fill material to build a pole barn and related improvements in a wetland without obtaining the necessary permits from plaintiff pursuant to Part 303 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.30301 *et seq.*, involving the protection of wetlands.

Kristina Wilson, who was employed by plaintiff, was the first person to observe the alleged unauthorized activity on Brotherton's property in June 2014. According to Wilson, she was responding to an unrelated complaint in the area when she saw a "new road" that had been constructed near the shoreline of South Manistique Lake in what Wilson referred to as "regulated wetland." Wilson took photographs that were admitted into evidence at trial. Wilson's first picture showed the "new fill placement" for the road, located within 500 feet of South Manistique Lake. Wilson did not observe a permit posted on the site that would have indicated that the activities had been authorized by plaintiff. Wilson posted a Notice of Violation on a tree on the property indicating that the observed activities violated Part 303 of the NREPA. Because Wilson's coworker, Ryan McCone, was responsible for the area where the property was located, Wilson put McCone's contact information on the Notice of Violation.

McCone, who was employed by plaintiff as a quality analyst at the time, was contacted by Brotherton as a result of the posted Notice of Violation. McCone met with Brotherton on the subject property on August 1, 2014. Brotherton indicated that he had constructed the road to harvest a stand of cedar trees at the west end of the new logging road. Based on this visit to the property, McCone completed a standard Wetland Determination Data Form. McCone explained, "This is a form where information collected at a sample point in the field is recorded for use in determining whether this site that -- that's the sampled site that's representative of the area is wetland or not." McCone determined that the area surrounding the new logging road was a wetland because all three necessary components of a wetland—hydric soil, wetland hydrology, and hydrophytic vegetation—were present.

McCone further concluded that Brotherton had constructed the new logging road[2] without minimizing its impact on the wetland area. McCone noted that the new fill for the road had "buried the wetland" and that he found a non-native, invasive species of upland plant growing in the fill. He also stated that the road was approximately 200 feet from the lake, was wider than necessary based on his observation of the width of the tracks from the equipment driving on the road, that the fill was too deep, and that the new road had been built parallel to a pre-existing "two track" road that had previously been created for logging. Additionally, McCone expressed concern that

---

[2] There was a discussion on the record between the attorneys and the trial court clarifying that the "new" road, which is the subject of this lawsuit, was built over at least "portions" of a pre-existing two-track or "skid" road. There was also the separate two-track road that remained to the south of the new road. This separate two-track road to the south is not at issue in this lawsuit.

the culverts under the road were not properly embedded in the soil and that plastic culverts were used rather than steel culverts. Culverts serve to allow an unimpeded path for surface water that would normally drain across a wetland area to continue to flow through the fill used to create the road. Functional culverts prevent the road from acting as a dam. McCone was concerned that the weight of the fill used for the road, along with heavy equipment driving on the road, would crush the plastic culverts and prevent them from functioning properly.

At some point in late 2014 or early 2015, Wilson viewed an aerial image of the area surrounding the road that showed that fill had also been placed in an area south of the new logging road. Wilson stated that she was not aware of this additional area of fill before she viewed this areal image. On April 29, 2015, Wilson conducted an onsite investigation of the newly discovered additional fill area, which contained a pole barn, septic field, and driveway.[3] She estimated that the driveway was approximately 240 to 270 feet long. Based on her investigation, Wilson determined the site was situated in a wetland.

The pole barn was on property owned by defendants Peter and Dana Corogin, and the driveway ran from Brotherton's property to the pole barn. According to Peter's affidavit, he had purchased this property from Brotherton on August 14, 2014, after Brotherton "cleared the land, placed the fill for the pole barn, the septic field, and the lay-down area around the future site of the pole barn." Peter averred, "Other than negotiating the purchase price for the property and the price of Mr. Brotherton's performing the pre-purchase activities, I did not have any involvement with any activity on the property prior to August 14, 2014." After closing on the property, Peter hired other contractors to construct the pole barn. Peter stated that these contractors obtained any necessary permits. Peter averred that Brotherton never informed him that "the site of the pole barn or any other portion of the purchased property was a regulated wetland." Peter further averred that he did not know that his property was regulated wetland until he received the July 6, 2015 notice of violation from plaintiff and that "[t]hroughout the process of planning and constructing the pole barn neither I nor the contractors I hired understood that a Wetland Permit was necessary."

In 2017, plaintiff initiated this civil action against Brotherton and the Corogins in the Ingham Circuit Court. Plaintiff sought injunctive relief and civil fines for the filling of a wetland and for maintaining a use in a wetland without a permit in violation of Part 303 of the NREPA. The complaint alleged that Brotherton had not complied with a March 11, 2015 Order to Restore issued by plaintiff that required Brotherton to remove the unauthorized fill material and restore the wetland to its original grade with respect to the logging road that had been built without first obtaining a Part 303 permit from plaintiff. The complaint alleged that Brotherton placed fill material on his property to create the driveway leading to the Corogins' pole barn. Additionally, the complaint alleged the Brotherton was the contractor responsible for placing the fill material on the Corogins' property related to the pole barn, septic system, and driveway. Brotherton also allegedly installed the septic system and a well on the Corogins' property. The complaint further

---

[3] Wilson testified that the driveway leading to the pole barn consisted of "fresh top dressing" or "additional sand material base" applied to a "pre-existing skid trail." She stated further that this roadway was not "improved in scope."

alleged that Brotherton and the Corogins had failed to comply with August 25, 2016 orders to restore the wetland relative to the pole barn, septic system, and driveway area.

Brotherton's subsequent motion to change venue to Mackinac County, where the subject property is located, was granted. The Corogins reached a settlement agreement with plaintiff, and the matter was dismissed with prejudice as to the Corogins.[4] The case remained pending with respect to Brotherton. Based on the settlement with the Corogins, plaintiff was not seeking removal of the pole barn, septic system, or driveway leading to the pole barn. With respect to the pole barn site,[5] plaintiff was seeking to hold Brotherton liable for a fine regarding those activities.

The matter eventually proceeded to trial. At the beginning of trial, the court ruled that it would rely on the version of Part 303 of the NREPA as it existed in 2014 at the time of the underlying events and not as subsequently amended.[6]

Plaintiff called McCone to testify as an expert in the field of wetland science and the administration and application of Part 303. McCone testified that during his August 1, 2014 visit to the property, he walked the length of the approximately 1,420-foot long road and observed the vegetation. McCone determined that the predominate vegetation consisted of species that tended to grow in wet conditions such as yellow birch, red maple, quaking aspen, a type of bulrush that was very indicative of wetland conditions, a wetland species of fern, and cattail. McCone stated that he found "muck soils, which are an organic hydric soil common in wetlands," at several places "across this site." He could identify this soil by its dark color, the presence of algae, and "cracking" in the soil. McCone testified that he determined there was wetland hydrology because he found saturation beginning at a depth of 2 inches below the soil surface.

As previously stated, McCone completed a standard Wetland Determination Data Form based on information collected from a sample point in the field during his August 1, 2014 visit. He described the area containing the logging road as "a swamp." He also determined that the area was a wetland because it had hydric soil, wetland hydrology, and hydrophytic vegetation, which were the three necessary components of a wetland. McCone specifically stated,

> That conclusion in this summary was based on the documented presence of a dominance of hydrophytic vegetation and all of the vegetative layers that were present. The hydric soil was present. That was based on the profile of the soil pit that was done. And that there was indicators of wetland hydrology present sufficient to fulfil all three requirements to show that this was, indeed, a wetland.

McCone testified that he followed the procedures and requirements for making wetlands determinations as set forth in the *United States Army Corps of Engineers Wetland Delineation*

---

[4] The Corogins are not parties to this appeal.

[5] We refer to the entire area encompassing the pole barn, driveway, and septic system as "the pole barn site."

[6] The parties agreed that the former version of the statute was applicable.

*Manual* and the *Northcentral and Northeast Regional Supplement*, as required by statute. He explained that he took one sample point for the road because of the homogeneity and consistency of the vegetation in the area. As he investigated the area along the road, he "saw nothing out there that would indicate that there was a chance for significant difference from one area adjacent to the road to another." McCone further indicated that "the *Northcentral and Northeast Regional Supplement* allows for that where you have a rather homogeneous site to collect just, you know, one or a few sample points." McCone opined that the area surrounding the logging road was a regulated wetland under the statute based on the required standards for determination of a wetland and the wetland's proximity to South Manistique Lake.

McCone testified about the construction of the road, stating that the "depth of the fill for this road was in some places five feet, I mean, several feet deep, far beyond what you would typically see for a forest road or a logging road." He also opined that the road was too wide because it was significantly wider than the track marks made by the equipment using the road. According to McCone, the road had been created from fill approximately 2 to 5 feet deep, and the road was approximately 20 to 35 feet wide. The road had also been built parallel to a pre-existing "two track" road that had previously been created for logging. McCone opined that there would have been less impact on the wetland by using the pre-existing road.[7] McCone expressed concern that plastic culverts were used rather than steel culverts. Culverts serve to allow an unimpeded path for surface water that would normally drain across a wetland area to continue to flow through the fill used to create the road. Functional culverts prevent the road from acting as a dam. McCone explained his concerns:

> While plastic pipes are common, they're suitable for only a certain amount of cover. That's the depth of material over them.
>
> Because they're plastic, they don't have the strength that metal does, and if you place too much fill over them or if you run equipment that's too heavy over them, you will crush them.
>
> And when they get crushed, it's kind of like if you take a plastic straw and bend at the two ends, then it'd stick up, and it no longer functions properly.

McCone additionally testified that the culverts were not installed properly. He explained that the culverts should have been embedded in the soil, with about 20% of the diameter of the culvert below the soil surface, in order to properly function to convey hydrology and allow wetland wildlife to pass through the road. The culverts in Brotherton's logging road were not embedded. The culverts were also too long and extended beyond the width of the road. Finally, discussing one particular culvert, McCone stated that there was "a bag of Quikrete concrete mix sitting on top of [the ends of the culvert] apparently trying to weigh that down because the end of the pipe was elevated from the amount of fill placed in the center of the culvert." He further explained, "The

---

[7] There was clarification on the record in a discussion involving the trial court and the parties' attorneys, in which it was explained that there were two old "two-track" roads and that portions of the new logging road at issue in this case involved improvements to one of the old two-track roads (Tr I, 82-83).

significance of that is that there's really no reason to put ballast or weight on the end of a culvert if it's properly installed. In this case the only reason you'd do that is to try to weigh the end of the culvert down because it's become elevated."

McCone opined that Brotherton, in constructing the new logging road,[8] had not minimized his impact on the wetland area. He also stated that the new fill for the road had "buried the wetland" and that he found a non-native, invasive species of upland plant growing in the fill.

Wilson, testifying as an expert in wetland science and administration and application of Part 303, agreed that the road was not constructed in a manner that would minimize the adverse impact on the surrounding wetlands because of its excessive width and depth, as well as its impedance to the free flow of water between sides of the road. Wilson noted that the culverts were not properly installed and that there were signs of excessive standing water near the road, which indicated that the culverts were not functioning adequately to allow water to pass through the road. Wilson opined that the road was acting as a barrier to the free flow of water in the wetland, which would contribute to a change in the vegetation and soil conditions and impact the wetland beyond the actual footprint of the road.

Plaintiff's logging experts, David Price and Warren Suchovsky, both testified that Brotherton could have harvested the trees without building the road because other viable alternatives existed. Both testified that Brotherton could have conducted logging operations during a cold winter while the ground was frozen and the impact on the soil would thus be diminished. Brotherton also could have used pre-existing roads or temporary roads. Price further explained that Brotherton could have used cabling or skidding methods to bring the logs harvested from the wetland area up to the adjacent upland to the south instead of constructing the east-west logging road at issue in this litigation through the wetlands. Suchovsky also referred to "harvesting equipment" that could have been used to reach the wetland trees from the upland area.

Wilson also testified about her visit to the pole barn site on April 29, 2015. It was late spring, and there was still some snow on the ground. Wilson opined that the pole barn site was a wetland, with hydrology draining downhill toward the lake to the north. Wilson also opined that south of the pole barn site, and uphill, was a transition area where the ecology transitioned to non-wetland based on the change in the tree species and vegetative community. Wilson explained that she determined the pole barn site was in a wetland based on the (1) dominance of wetland vegetation, (2) presence of hydrology as evidenced by the water table within 11 inches of the soil surface and water saturation to the soil surface, and (3) presence of hydric soil based on the indicators she observed in her soil samples. Wilson's determination was based on two data collection points near the pole barn, including soil samples at those sites. She also confirmed the presence of hydric soil near the driveway. Wilson did not find any frozen conditions in her soil pits. She testified that her data collection process was in accordance with the Army Corps of

---

[8] There was a discussion on the record between the attorneys and the trial court clarifying that the "new" road, which is the subject of this lawsuit, was built over at least "portions" of a pre-existing two-track or "skid" road. There was also the separate two-track road that remained to the south of the new road and this is not at issue in this lawsuit.

Engineers manual and the regional supplement. She determined that this site was a regulated wetland based on its size and proximity to the lake.

On cross-examination, Brotherton's counsel questioned Wilson about the National Resource Conservation Service (NRCS)[9] soil survey map of the area surrounding Brotherton's property. Wilson acknowledged that according to the soil survey map, "approximately half, if not a little more than half," of the logging road was in Iosco sand, which is a non-hydric soil. Wilson also appeared to agree with Brotherton's counsel that her soil samples for the pole barn site came from areas designated as non-hydric soils on the soil map. On direct examination, Wilson had explained that the soil survey maps are essentially estimates of the locations of various soil types, created by comparing soil samples collected from the ground in discrete locations with aerial images of the vegetation in the area, topographic maps, known water features, and other relevant data. Wilson opined that there could be inclusions of other minor soil types that differed from the major soil type shown on a soil survey map. She stated, "we observed hydric soils within those mapped units [of non-hydric soils]." Wilson also testified,

> The soil maps themselves, the data contained in those soil maps are not used to make a wetland determination as required by this *Northcentral and Northeast Regional Supplement*.

> But the soil map descriptions tell us what types of vegetative communities and the hydrology that we could anticipate to find at a specific site.

Wilson maintained that her methods for determining that the pole barn site was in a wetland were in accordance with U.S. Army Corps of Engineers manual and the regional supplement, and she also maintained that she determined both sample points were in wetlands.

Brotherton's counsel similarly cross-examined McCone about the soil survey map with respect to the logging road. McCone acknowledged that "roughly half" of the road was in the non-hydric soil, Iosco sand, according to the soil survey map. The soil map indicated that the other half of the road was in hydric soils. McCone collected his soil sample from the area shown on the soil map as consisting of hydric soil. However, McCone also stated that soil maps are approximations and that his method of determining that hydric soil was present for the area containing the road was proper according to the Army Corps of Engineers manual and regional supplement.

Brotherton testified that he earns most of his income through "logging operations" and that he constructed the road at issue in this case for purposes of harvesting timber on his property. He currently cuts his own trees and pays a log truck driver to haul his logs to the saw mill. In the past, he had contracted with companies to harvest the trees on his property. In some situations, he would still hire a contractor to cut his trees.

---

[9] The NRCS is a federal government agency that is part of the United States Department of Agriculture (USDA).

When he was asked how he selected the location for the logging road at issue, Brotherton replied that there was an existing "skid trail" in that location that he "upgraded . . . to being a logging road" and that it was the "shortest path" and required "the least amount of work" to access the trees he was going to harvest. Brotherton indicated that there was "a greater concentration of quality timber more towards the end of the road," but he was also harvesting trees along the entire length of the road. He also explained that a fully loaded logging truck weighs approximately 165,000 pounds and could not traverse a skid trail. Brotherton indicated that he constructed his new road to accommodate a logging truck, which he thought was necessary to access the timber. He did not believe the nearby alternative trail, which McCone had stated should have been used, was a viable alternative because it was closer to the lake and involved navigating a hill and more turns, which would have required even more fill to construct a road that would accommodate a logging truck. Brotherton testified that he did not build the new logging road any wider or deeper than necessary. Brotherton admitted that one of the plastic culverts had failed, causing water to back up and wash out the road.

Brotherton admitted that it was possible to access the area without a road during the winter if the weather was cold enough for a sufficient time, but he indicated that recent winters had not provided the necessary weather conditions. Brotherton indicated that he had attempted to use the skid trail before he added the fill to turn it into the logging road at issue, but this was not a viable alternative because his vehicles became stuck due to the wet conditions.

Brotherton additionally presented the testimony of Rory Mattson as an expert in wetland identification and delineation, forestry, timbering and logging, forest and logging roads, and construction of forest and logging roads.

Mattson agreed that an area could not be considered a wetland if it did not have wetland hydrophytic vegetation, hydric soil, and hydrology. He opined that the area at the far west end of the logging road, where he dug two holes and found "muck soils," was "probably considered wetland." Mattson based this opinion on the hydric soil, vegetation, and hydrology he found in that area. Mattson further testified that he did not know where the wetland ended and that he could not figure out the boundary line of the wetland without spending substantially more time on the site and digging "numerous, numerous holes." He estimated that he dug about "a dozen" holes along the road. He also explained that according to the NRCS soil survey map, the soil in most of the area through which the road traveled was Iosco sand, which is a non-hydric soil, and the holes that he dug along the road confirmed that this soil mapping was accurate. Mattson therefore opined that the logging road was not exclusively located in a regulated wetland. He disagreed that one soil sample in this case was sufficient to determine that the entire 1,420-foot road was in a wetland, and he disagreed that the vegetation was fairly uniform along the entire length of the road. Mattson opined that there were small inclusions of "miniature" wetlands within the upland, Iosco sand portion of the road, so he determined the area was not a wetland. He stated, it was "definitely an upland."

Mattson further explained that the characteristics of the environment frequently changed in this area:

In this instance, if you go to the lake and you start working yourself north -- south. Excuse me. North would be the lake. South, you'll see the timber change within probably a hundred to 200 feet, and then the timber types change again.

And there's numerous what I would call wetland draws or ephemeral draws, which means they live for one day. Basically, snow melt areas, because there's a slope there, and that water is going to, through snow melt, through large precipitations, and then work its way to the lake.

\* \* \*

So there's -- there's just numerous, numerous changes throughout this whole area along that lake.

Mattson disagreed that harvesting methods involving cabling or skidding the logs out of the wetland were practical alternatives to constructing the logging road; Mattson believed that such methods would destroy Brotherton's property as the trees were dragged across the ground. However, he clarified that this process would not damage the soil but would tear up any vegetation. Mattson also testified that the width of the road Brotherton constructed was reasonable and not excessive. According to Mattson, the large equipment to be used on the road for logging purposes required that the road be sufficiently wide at turns and have only gradual inclines. Mattson stated that the width of this logging road was typical and that he had seen multiple logging roads that were wider. Mattson testified that a logging road needed to be significantly wider than the width of the equipment that would drive on it. He opined that the placement of the logging road was "perfect." Mattson indicated that there were no alternative routes for the logging road that would have less impact on the wetland and that Brotherton used the shortest, most direct route with "the least impact in the whole area."

Mattson testified that plastic culverts could be used if they were installed correctly, but he opined that steel culverts were "the best." He explained that if plastic culverts were not properly sunk partially into the ground or if too much of the plastic protruded beyond the edges of the road, then snow and ice would often cause plastic culverts to bend up and fail, which in turn would cause the road to wash out. Mattson opined that if an insufficient amount of fill was placed over the plastic culverts, the weight of the logging trucks would not be sufficiently distributed and the trucks would crush the culverts. Mattson opined that the trucks, rather than excessive fill, presented the risk of crushing the culverts. Mattson testified that he told Brotherton that all of his culverts were showing signs that they were potentially going to fail.

Additionally, Mattson critiqued the adequacy and quality of plaintiff's analysis of whether the pole barn site was a wetland. Mattson testified that the soil map showed that the pole barn site was comprised of Solona Loam, which is a non-hydric soil. Mattson also testified that it was not uncommon in the Upper Peninsula for snow to be on the ground in April, when Wilson conducted her evaluation, and that hydrology determinations should be made "probably the 15th of June or later" so the results are not improperly influenced by "spring run-off, melt, and/or high precipitation events in April and May, which the U.P. always gets." Mattson did not believe that Wilson collected sufficient soil sample data to conclude that the entire pole barn site consisted of hydric soil.

Mattson also disagreed with Wilson's conclusion regarding wetland vegetation because he would not have concluded that the mixture of vegetation documented by Wilson justified the conclusion that wetland vegetation was present. Mattson opined that Wilson's data sheets did not evidence predominantly facultative wetland vegetation as Wilson had claimed to have observed when testifying at trial. Essentially, Mattson disagreed that Wilson's documented vegetation data justified her conclusion about the presence of wetland vegetation, and Mattson would not have concluded from the documented vegetation data that the area contained hydrophytic wetland vegetation for purposes of determining the area was a wetland. Mattson opined that Wilson did not conduct an adequate investigation to determine that the pole barn site was a wetland.

Plaintiff called Chad Fizzell as one of its rebuttal witnesses. Fizzell, an environmental quality specialist for plaintiff's wetlands, lakes, and streams unit, testified as an expert in Geographic Information Systems (GIS),[10] aerial photograph interpretation, and aerial wetland mapping. He stated that his "typical responsibilities include coordinating the wetland inventory efforts for the state," which involves "[e]ssentially mapping the wetlands of the state." Fizzell also explained that "the way the wetlands are mapped in the state from a state-wide perspective is from aerial imagery," noting that wetlands "are very distinctive on aerial imagery" because the presence of water and wetland vegetation could be discerned from the images. Fizzell testified that he used multiple years of aerial imagery, GIS, and high-resolution topography to create a map showing the wetland boundary for the area at issue in this case. This map showed that wetlands encompassed the entire logging road and pole barn sites. Maps like this one are used as "guides," so it was always necessary to have an expert conduct an on-the-ground wetland boundary determination as well.

Wilson also testified on rebuttal that she followed the protocols of the regional supplement in completing her data sheets for the pole barn site and that her data for the site satisfied the dominance test outlined in the manual for concluding that hydrophytic vegetation was the dominant type of vegetation on the site with respect to both of her sample points. Wilson agreed that the regional supplement cautioned that some hydrology indicators could be naturally temporary or seasonal and impacted by meteorological conditions. Wilson further agreed that the regional supplement cautioned that surface water could be present in non-wetland areas after rainfall, periods of unusually high precipitation, or runoff, and that if surface water was observed outside of the growing season and it was questionable whether wet conditions normally extended into the growing season, a follow-up visit during the growing season could be necessary. Wilson acknowledged that her April visit to the pole barn site was "[p]robably not during the growing season" and that she did not conduct a follow-up wetlands investigation on the site during the growing season.

Following the bench trial, the trial court issued a written opinion containing its findings of fact and conclusions of law. The trial court found that plaintiff had not proven by a preponderance of the evidence that the pole barn site was a wetland, specifically due to what the court found to be an inadequately performed analytical process by plaintiff, and that Brotherton therefore did not

---

[10] According to Fizzell, "GIS is essentially digital mapping where we're taking, you know, multiple layers of data and overlaying them within an additional mapping system."

need to obtain a wetland permit to complete the work he performed on that site. The trial court additionally found that the logging road was exempt from the permit requirement pursuant to MCL 324.30305(2)(j) because adverse impacts on the wetland had been minimized.

On a related note, the trial court found "[t]hat the roadway, as used, developed and constructed by the Defendant was a logical and practical route given the general nature of the property involved and equipment contemplated to be used in harvesting his timber." Finally, the trial court ordered Brotherton to take the following actions:

> A.) That the Defendant shall, within a reasonable time, 45 days from the date of this order, retain a professional wetland consultant, (a non-witness) to review the stated concerns of the DEQ, per correspondence received by the Defendant on the logging road site only;

> B.) That said consultant shall review the site in a timely fashion to determine the most reasonable path to address those stated concerns of the DEQ, and state within 120 days from the date of hire, a written plan any steps he or she may determine are necessary, if any, to accomplish or rectify those concerns. The plan shall be submitted for review and comment by the DEQ within 30 days from receipt, and a copy submitted to the Court. The plan shall also outline a reasonable timetable for the completion of any remedial tasks determined necessary. Culvert repairs may commence as soon as practical, consistent with standard practices for the same.

> C.) The Court will retain jurisdiction and reserve, until the completion of this review, and satisfactory resolution of the matter and its assessment of any fines against the Defendant.

Following the completion of the report by Brotherton's consultant, the trial court entered a final order in which it declined to impose fines or penalties but ordered "those remedial measures such as culvert repair must be addressed before further activity can commence by the Defendant."

This appeal followed. Further facts will be discussed in the analysis section below as necessary.

## II. ANALYSIS

### A. SUMMARY DISPOSITION

On appeal, plaintiff first argues that the trial court erred by denying its pretrial motion for partial summary disposition on the issues whether both the logging road and the pole barn sites were regulated wetlands.

Plaintiff moved for partial summary disposition under MCR 2.116(C)(10), arguing that it was entitled to judgment as a matter of law regarding liability for the violation involving the fill placed by Brotherton related to the pole barn, driveway and septic field because there was no genuine issue of material fact that Brotherton admitted to placing the fill without a permit, that plaintiff's experts determined the pole barn area was a regulated wetland, and that Brotherton's

only named expert had not been asked to give an opinion on the pole barn area. Regarding the fill for the new logging road, plaintiff argued that there was no genuine issue of material fact that Brotherton placed the fill without a permit and that both plaintiff's experts and Brotherton's expert agreed that the road went through a regulated wetland. Plaintiff thus contended that the only disputed issue for trial regarding liability was "whether Defendant Brotherton's activities qualified for the forest road permit exemption in MCL 324.30305."

The evidence relied on by plaintiff in support of its motion included deposition testimony of Brotherton and Brotherton's expert witness, Mattson. Brotherton testified that he placed the fill on the pole barn site to level the site for construction of the pole barn and to "upgrade" the existing "skid trail" leading to the location for the pole barn. Brotherton testified that he placed the fill to improve another existing skid trail into the logging road at issue so that he could drive a logging truck on the road.[11] This logging road was "about a quarter mile long." However, Brotherton did not believe that he needed a permit from plaintiff to build the road because he built the road for the purpose of conducting logging operations.

Mattson testified in his deposition that he went to the property to assess whether he thought the new logging road violated Part 303, to assess whether the road qualified for the forest road exemption to the permit requirement, and to give Brotherton "guidance." Mattson opined that "[p]art of this road is wetland, part of it is not wetland." However, Mattson testified that he was not as concerned with the precise boundaries of the wetland and non-wetland areas because the most important issue was whether the logging road had been constructed to minimize its impact on the wetlands such that it could qualify for the forest road exemption; Mattson explained that this was the focus of his assessment. Regarding the pole barn site, Mattson testified that he "did not go into this site" but was "requested to come back for that on a separate issue." Mattson clarified that he originally went to Brotherton's property to inspect the logging road and that he returned later only for "forestry" inspection purposes.

Plaintiff additionally relied on the affidavits of Wilson and McCone in which they each opined, respectively, that the pole barn site and logging road area were regulated wetlands. Finally, plaintiff cited Brotherton's forest management plan, which acknowledged that much of his property was wetland and soil sensitive such that there were limitations on the process to be used for logging the property. The forest management plan was prepared for Brotherton by a forester and covered over 250 acres of property. The forest management plan stated that Brotherton's objective was as follows:

> Based on acres and percentage of soils in the Markey and Charbondale; Angelica Muck class, objective for this property is wildlife and timber management. Due to sensitivity and equipment limitations on these soils, objective would be selected seasonal harvesting only. It is the intention of owner to harvest

---

[11] The logging road and the driveway to the pole barn were treated as two distinct roadways in the trial court, but they apparently intersect via an intervening road at some point near the eastern end of the logging road.

these properties as the correct opportunity for harvesting becomes present. Example would be Very dry summer or extremely cold winter.

Brotherton opposed plaintiff's motion for partial summary disposition. He argued that Mattson had opined that the logging road was not in a protected wetland except for approximately 200 feet of the western portion of the road. Brotherton further argued that Mattson had examined the pole barn site, including the areas containing the driveway and septic system, and that Mattson had opined that these sites were not in a protected wetland. Brotherton maintained that the conflicting expert opinions created a genuine question of material fact and that plaintiff was therefore not entitled to summary disposition.

Brotherton attached an affidavit by Mattson, in which Mattson averred that he had inspected both the logging road site and the pole barn site. Mattson averred that based on his inspection, he determined that most of the logging road was constructed in non-hydric soil and thus was not in a wetland. Mattson further averred that he observed some "ephemeral drainage areas" that allowed water movement from higher to lower terrain but that "only exist for a short period following precipitation or snow melt." It was Mattson's opinion that "only about 200 feet of the west end of the road is in a wetland." Additionally, Mattson averred that the pole barn site was not in a wetland based on the nature of the vegetation and soils in the area.

Brotherton averred in his affidavit, which was also attached to the response, that he "did not believe that the upgraded logging road or the Corogin driveway, pole barn and septic system were built in wetlands." He also averred that in performing the work on the pole barn site, he obtained "a septic permit from the Mackinac County Health Department." A copy of this permit was attached to Brotherton's response. On the permit approval documents, there were comments that "[m]uck layer at test hole areas was saturated" and that the muck layer would have to be "[s]crape[d] off" before installing the system.

Plaintiff filed a reply, arguing that the trial court should quash the affidavits of Brotherton and Mattson because they contradicted Mattson's prior deposition testimony. Plaintiff contended that Brotherton could not create a question of fact by relying on affidavits that contradicted the deposition testimony of Brotherton's expert. Plaintiff further argued that Mattson had testified that he did not inspect the pole barn site to determine whether it was a wetland. Plaintiff also claimed that Mattson's affidavit and deposition testimony were contradictory with respect to the "wetland draws" through which the logging road traveled. Plaintiff argued that Brotherton had failed to supplement his discovery responses to reflect any new information obtained after Mattson's deposition was taken. Moreover, plaintiff claimed that it had requested the "facts and opinions to which any of Defendant's experts would testify and the ground for those opinions," but Brotherton had not provided this information.

The trial court held a hearing at which it heard oral arguments from the parties. Plaintiff argued consistently with its written filings and also noted that Brotherton had not contested that he placed the fill in the areas at issue without a permit. Brotherton's counsel argued that the pole barn site was not a wetland, that the logging road did not run entirely through wetlands, and that the logging road met the forestry road permit exemption. Brotherton's counsel also argued that Mattson's affidavit was not inconsistent with his deposition testimony because during Mattson's deposition, plaintiff never asked him any questions about the pole barn site. Furthermore,

-13-

Brotherton's counsel maintained that Mattson's deposition testimony and affidavit were consistent with respect to his opinions regarding the logging road.

The trial court issued a written order, striking Brotherton's untimely exhibits, affidavits, and additional witnesses. The trial court additionally ruled that there was no genuine issue of material fact that Brotherton placed the fill for both the road and the pole barn site, and that Brotherton did so without permits from plaintiff. The court concluded, however, that there were genuine questions of fact regarding whether the logging road and pole barn sites were in wetlands and whether the logging road met the requirements for the permit exemption. The trial court explained its summary disposition ruling in pertinent part as follows:

> As noted above, the standard of review in these matters requires the Court to view the matter in a light most favorable to the party opposing the Motion(s). It is anything but clear to this Court that the specific road construction area is a wetland in its entirety, given the experts conflicting testimony and even if a wetland, as pointed out by the Plaintiff, the issue of the road still rests on whether the Defendant is exempt from MDEQ requirements under MCL 324.30305.
>
> The Court, on these facts, takes judicial notice that fill was placed in a disputed wetland area and that no permits were pulled in order to comply with the same. The Court's findings would also agree on the same points as to the matter of the pole barn, road and septic system being constructed without permits from the MDEQ, in an arguably wetland area, noting for the record that various permits were pulled by the Defendant, from other governmental entities, for the establishment of the septic system and pole barns construction.[12]

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is proper under MCR 2.116(C)(10) if "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A party may move for dismissal of or judgment on all or part of a claim in accordance with this rule." MCR 2.116(B)(1). On a motion under 2.116(C)(10), "a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion," and the motion may only be granted if "there is no genuine issue of material fact." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

---

[12] The trial court also stated: "The Court, having reviewed the matter of Motions for Partial Summary Disposition under MCR 2.117 (C) (10) [sic] and the Motion to Strike, GRANTS, in limited scope, by the Court taking judicial notice only of the facts argued under the Motion for Partial Summary Disposition, as noted below. The Court also GRANTS the Motion to Strike, for the below stated reasons."

"The NREPA is a comprehensive statutory scheme containing numerous parts, all intended to protect the environment and natural resources of this state." *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 13; 896 NW2d 39 (2016) (quotation marks and citation omitted). Activities in wetlands are controlled by Part 303 of the NREPA. See *Huggett v Dep't of Natural Resources*, 464 Mich 711, 715; 629 NW2d 915 (2001); MCL 324.30301 *et seq*.

Plaintiff's complaint alleged that Brotherton's activities with respect to the logging road and the pole barn site violated MCL 324.30304(a) and (c). At the time of the alleged violations,[13] the statute provided:

> Except as otherwise provided in this part or by a permit issued by the department under sections 30306 to 30314 and pursuant to part 13, a person shall not do any of the following:
>
> (a) Deposit or permit the placing of fill material in a wetland.
>
> * * *
>
> (c) Construct, operate, or maintain any use or development in a wetland. [MCL 324.30304, as amended by 325 PA 2004.]

Further, MCL 324.30301 provided in relevant part as follows regarding the determination of a regulated wetland:

> (1) As used in this part:
>
> (a) "Department" means the department of environmental quality.
>
> * * *
>
> (m) "Wetland" means land characterized by the presence of water at a frequency and duration sufficient to support, and that under normal circumstances does support, wetland vegetation or aquatic life, and is commonly referred to as a bog, swamp, or marsh, and which is any of the following:
>
> (*i*) Contiguous to the Great Lakes or Lake St. Clair, an inland lake or pond, or a river or stream.
>
> (*ii*) Not contiguous to the Great Lakes, an inland lake or pond, or a river or stream; and more than 5 acres in size.

---

[13] As previously stated, the trial court ruled that it would rely on the version of Part 303 of the NREPA as it existed in 2014 at the time of the underlying events and not as subsequently amended. This ruling is not challenged on appeal. Nonetheless, the minor changes in the subsequent amendment to MCL 324.30304 have no bearing on the issues presented in this appeal. See MCL 324.30304, as amended by 631 PA 2018.

(*iii*) Not contiguous to the Great Lakes, an inland lake or pond, or a river or stream; and 5 acres or less in size if the department determines that protection of the area is essential to the preservation of the natural resources of the state from pollution, impairment, or destruction and the department has so notified the owner.

(2) The department and local units of government shall apply the technical wetland delineation standards set forth in the United States army corps of engineers January 1987 wetland delineation manual, technical report Y–87–1, and appropriate regional United States army corps of engineers supplements, in identifying wetland boundaries under this part, including, but not limited to, section 30307. [MCL 324.30301, as amended by 247 PA 2012.[14]]

On appeal, plaintiff argues that it was entitled to judgment as a matter of law that both the logging road site and pole barn site were regulated wetlands because there was no evidence properly before the trial court from which it could conclude that there were genuine issues of material fact whether the disputed areas were regulated wetlands. Plaintiff maintains that Mattson's affidavit provided the only basis on which the trial court could have found a genuine factual dispute on these issues but that Mattson's affidavit could not be considered because it contradicted his deposition testimony. Specifically, plaintiff argues that although Mattson testified in his deposition that he never reviewed the pole barn site to determine whether it was in a regulated wetland, he contradicted this testimony in his affidavit by stating that he had inspected the pole barn site and concluded that it was not in a regulated wetland. Plaintiff additionally argues that Mattson's statement in his affidavit that the logging road was not constructed in a regulated wetland except for a small portion of the road at the western end contradicted his deposition testimony that the western end of the logging road was in a regulated wetland and that the rest of the logging road traversed multiple small wetland areas that were regulated wetlands because they were contiguous to the lake.

"This Court has held that parties may not contrive factual issues merely by asserting the contrary in an affidavit after having given damaging testimony in a deposition." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 480; 633 NW2d 440 (2001) (quotation marks and citations omitted). "Deposition testimony damaging to a party's case will not always result in summary judgment. However, when a party makes statements of fact in a clear, intelligent, unequivocal manner, they should be considered as conclusively binding against him in the absence of any explanation or modification, or of a showing of mistake or improvidence." *Id*. (quotation marks and citations omitted). Moreover, "this principle is not limited to parties who make contradictory assertions. The principle that contradictory affidavits should be disregarded stands irrespective of the identity of the maker of the conflicting statements." *Id*. at 481 (quotation marks and citation omitted).

---

[14] The definition of "wetland" is now contained in MCL 324.30301(1)(n). The definition is still similar, but it has undergone significant revision. See MCL 324.30301, as amended by 631 PA 2018. The effect of these revisions is not at issue in this case. Former MCL 324.30301(2) is now contained in MCL 324.30301(4) and the amended language only involves changes to capitalization. See MCL 324.30301, as amended by 631 PA 2018.

Here, the trial court struck Brotherton's and Mattson's affidavits but nonetheless concluded that there were genuine questions of fact regarding whether the logging road and pole barn sites were in wetlands. In its order, the trial court did not cite any specific evidence that the areas were not wetlands. Instead the trial court merely referred generally to "the experts conflicting testimony." Hence, the question becomes whether there was record evidence, without considering the affidavits, from which the trial court could properly conclude that there were genuine questions of material fact that both sites were regulated wetlands.

With respect to the pole barn site, Mattson averred in his affidavit that he had inspected the pole barn site and determined that it was not in a wetland based on the nature of the vegetation and soils in the area. Although Mattson's deposition testimony on this point was not as clear as plaintiff appears to believe, plaintiff is correct that Mattson indicated in his deposition that he did not originally inspect the pole barn site and that the record does not contain any deposition testimony by Mattson opining on whether the pole barn site was in a regulated wetland. Mattson appeared to imply in his deposition that he visited the pole barn at some unspecified date for some other forestry related issue, but the record does not contain any indication that Mattson provided further details about that visit in his deposition. Mattson's averment that the pole barn site was not in a regulated wetland was the only evidence Brotherton relied on for this proposition in opposing plaintiff's summary disposition motion. Plaintiff, however, provided an affidavit from its expert, Wilson,[15] that she had inspected the pole barn site and determined that it was a wetland that was contiguous to the lake and thus a regulated wetland.

Because the trial court struck Mattson's affidavit, the only evidence remaining before the trial court on summary disposition undisputedly indicated that the pole barn site was in a wetland for purposes of former MCL 324.30301(1)(m). Further, the trial court ruled that there was no factual dispute that Brotherton placed the fill and did so without a permit. Accordingly, there was no genuine issue of material fact that Brotherton violated MCL 324.30304 by his activities on the pole barn site. The evidence that Corogin did not know the site was a regulated wetland and that other necessary permits were obtained is not evidence that the site was not a wetland. Brotherton's bare allegations, denials, and arguments, without supporting record evidence were insufficient to establish a genuine issue of fact for trial. MCR 2.116(G)(4). "A litigant's mere pledge to establish an issue of fact at trial cannot survive summary disposition under MCR 2.116(C)(10). The court rule plainly requires the adverse party to set forth specific facts at the time of the motion showing a genuine issue for trial." *Maiden*, 461 Mich at 121.

The trial court could not somehow take "judicial notice" of the parties' arguments regarding whether the area was a wetland while simultaneously striking the only record evidence supporting Brotherton's position because, in doing so, the trial court essentially allowed Brotherton to proceed to trial on the issue whether the pole barn site was a wetland based solely on his promise to establish a factual issue at trial. *Id*.

The trial court also could not rely on any apparent disbelief of plaintiff's assertions or the court's view of the credibility of plaintiff's experts because "it is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for

---

[15] There is no indication that Wilson was ever deposed.

summary disposition." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 480; 776 NW2d 398 (2009). Furthermore, to the extent there was evidence actually admitted at trial that would support the existence of a genuine factual dispute regarding the pole barn's status as a wetland, that evidence is immaterial to deciding the question whether plaintiff's motion for partial summary disposition was properly denied because this Court's review of a decision on a motion for summary disposition "is limited to the evidence that had been presented to the circuit court at the time the motion was decided." *Id*. at 475-476.

"If the pleadings show that a party is entitled to judgment as a matter of law, or if the affidavits or other proofs show that there is no genuine issue of material fact, the court shall render judgment without delay." MCR 2.116(I)(1). The trial court erred by denying summary disposition to plaintiff with respect to Brotherton's violation of MCL 324.30304 on the pole barn site. *Maiden*, 461 Mich at 118.

With respect to the logging road, the evidence was more nuanced than plaintiff makes it appear in its appellate argument. Plaintiff submitted McCone's affidavit, in which he averred that he determined that the road went through a regulated wetland because the site was contiguous to the lake and satisfied the "three-factor approach" considering the following indicators: hydric soil, wetland hydrology, and hydrophytic vegetation. As relevant to the present discussion, McCone averred that hydric soils are soils "that formed under saturated, flooded, or ponded conditions for long enough periods of the growing season to develop anaerobic (i.e., oxygen depleted) conditions in their upper layers." He averred that the soil through which the road traveled was hydric soil because he observed 11 inches of organic, mucky peat soil over sand. McCone also explained:

> A single wetland sample point was collected at a point representative of the entire violation site to document the soil, vegetation, and hydrology characteristics present. I inspected the soils, vegetation, and hydrology characteristics at numerous locations through the remainder of the site and determined there was no considerable variation throughout. As such, additional sample points were deemed unnecessary.

Mattson testified in his deposition that "[p]art of this road is wetland, part of it is not wetland." Mattson also testified that he primarily focused on whether the road had been constructed in a manner that would minimize its impacts on the wetlands, rather than the precise boundaries of the wetlands, because he believed the most important question was whether the road could qualify for the forest road exemption to the permit requirement. Mattson also explained in his deposition that an area is a wetland if it has the requisite type of soil, vegetation, and hydrology, and that he agreed with the NRCS soil map showing that some of the area where the road was constructed was Iosco sand, which is a non-hydric soil. Mattson acknowledged in his deposition that the soil map was "only accurate to 2 to 3 acres," that there could nonetheless be wetland areas included within the area of the soil map generally designated as Iosco sand, and that this was "why you have to do the ground determination." Mattson testified that he found small areas of wetland that touched the lake in this otherwise upland area. However, he did not specifically discuss the nature of the soil in these areas he termed "wetland draws."

Accordingly, even without Mattson's affidavit, there was record evidence contradicting McCone's affidavit[16] that the logging road traveled entirely through wetlands. Reasonable minds could disagree regarding whether at least some portion of the road was not in a wetland, creating a genuine issue of material fact such that the trial court did not err by denying summary disposition on this issue. *El-Khalil*, 504 Mich at 160; *West*, 469 Mich at 183.

We affirm the trial court's denial of summary disposition regarding whether the logging road area is a wetland, but we reverse the trial court's summary disposition ruling regarding the pole barn site and remand for entry of an order granting summary disposition in favor of plaintiff on the issue whether Brotherton violated MCL 324.30304 by his activities on the pole barn site.

## B. FOREST ROAD EXEMPTION

Next, plaintiff challenges the trial court's rulings following the bench trial. Specifically, plaintiff argues that the trial court erred by determining the pole barn site and logging road area were not wetlands and that the trial court further erred by determining that the logging road met the statutory forest road exemption from the permit requirement.

As an initial matter, as a result of our conclusion on plaintiff's summary disposition argument plaintiff's argument regarding the trial court's ruling on the pole barn site after trial is moot. Because we have determined that plaintiff is entitled to judgment in its favor on Brotherton's violations for activities on the pole barn site, there is no further relief that this Court can grant plaintiff with respect to that issue. A matter becomes moot when "it presents only abstract questions of law that do not rest upon existing facts or rights" or "an event occurs that renders it impossible for a reviewing court to grant relief." *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). We thus confine ourselves to addressing plaintiff's arguments regarding the logging road.

Findings of fact made by the trial court following a bench trial may only be set aside on appeal if clearly erroneous. *Dep't of Environmental Quality v Sancrant*, 337 Mich App 696, 700, 714; 976 NW2d 874 (2021). "A finding of fact is not clearly erroneous unless there is no evidence to support it or the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id*. at 714 (quotation marks and citation omitted). This Court reviews de novo the trial court's conclusions of law, *Menhennick Family Trust v Menhennick*, 326 Mich App 504, 509; 927 NW2d 741 (2018), as well as any questions of statutory construction, *Sancrant*, 337 Mich App at 714.

As previously stated, the "NREPA is a comprehensive statutory scheme containing numerous parts, all intended to protect the environment and natural resources of this state." *Gomez*, 318 Mich App at 13 (quotation marks and citation omitted). Activities in wetlands are controlled by Part 303 of the NREPA. See *Huggett*, 464 Mich at 715; MCL 324.30301 *et seq*.

---

[16] There is also no indication that McCone was deposed.

Plaintiff alleged that Brotherton violated MCL 324.30304(a) and (c), which provided as follows at the time of the alleged violations:

Except as otherwise provided in this part or by a permit issued by the department under sections 30306 to 30314 and pursuant to part 13, a person shall not do any of the following:

(a) Deposit or permit the placing of fill material in a wetland.

* * *

(c) Construct, operate, or maintain any use or development in a wetland. [MCL 324.30304, as amended by 325 PA 2004.]

MCL 324.30301 provided in relevant part as follows regarding the determination of a regulated wetland:

(1) As used in this part:

* * *

(m) "Wetland" means land characterized by the presence of water at a frequency and duration sufficient to support, and that under normal circumstances does support, wetland vegetation or aquatic life, and is commonly referred to as a bog, swamp, or marsh, and which is any of the following:

(*i*) Contiguous to the Great Lakes or Lake St. Clair, an inland lake or pond, or a river or stream.

(*ii*) Not contiguous to the Great Lakes, an inland lake or pond, or a river or stream; and more than 5 acres in size.

(*iii*) Not contiguous to the Great Lakes, an inland lake or pond, or a river or stream; and 5 acres or less in size if the department determines that protection of the area is essential to the preservation of the natural resources of the state from pollution, impairment, or destruction and the department has so notified the owner.

(2) The department and local units of government shall apply the technical wetland delineation standards set forth in the United States army corps of engineers January 1987 wetland delineation manual, technical report Y–87–1, and appropriate regional United States army corps of engineers supplements, in identifying wetland boundaries under this part, including, but not limited to, section 30307. [MCL 324.30301, as amended by 247 PA 2012.]

"The NREPA sets forth a clear mandate that, absent qualification under one of several enumerated exceptions, a person must obtain a permit before placing fill material or maintaining a use in a wetland." *Matthews v Natural Resources Dep't*, 288 Mich App 23, 45; 792 NW2d 40 (2010), citing MCL 324.30304 and MCL 324.30305. Of primary importance in this case is the

forest road exemption from the permit requirement, contained in MCL 324.30305.  At the time of the alleged violations, this statute provided in relevant part:

> (2) The following uses are allowed in a wetland without a permit subject to other laws of this state and the owner's regulation:
>
> * * *
>
> (j) Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining or forestry equipment, if the roads are constructed and maintained in a manner to ensure that any adverse effect on the wetland will be minimized.  [MCL 324.30305(2)(j), as amended by 98 PA 2013.]

With respect to the logging road, the trial court ultimately based its ruling that a permit was not required for the road on the its conclusion that the road satisfied the forest road exemption to the permit requirement in MCL 324.30305(2)(j).  Although the trial court expressed doubt that the entire area surrounding the logging road was a wetland, the actual basis for the trial court's final ruling suggests that the court at least implicitly conceded, for the sake of argument, that the area was a wetland.  See MCL 324.30305(2)(j) (stating that the listed uses are generally "allowed in a wetland without a permit").

At trial, plaintiff presented evidence from its four experts that the new logging road had not been constructed in a manner that minimized adverse impacts on the wetland.  McCone and Wilson opined that the width of the road was excessive, and all of plaintiff's experts agreed that the depth of fill for the road was excessive.  Plaintiff's experts also gave evidence that the road impeded the free flow of water due to its improperly installed and failing culverts.  There was further evidence that adverse impact to the wetland could have been diminished if Brotherton had chosen an alternative route for the road or used alternative methods for harvesting the timber that would not have required him to build a new, permanent road.

However, defendant presented contradictory evidence that plaintiff's proposed alternatives were not practical in this situation and that the new logging road was a necessary means for harvesting the desired timber.  Defendant also presented evidence that he built the logging road to create the shortest, most direct path to the trees to be harvested and that the chosen location created the least adverse impact on the whole area.  Defendant also indicated that in building the road, he upgraded an existing skid trail.

The trial court weighed the conflicting evidence and found that the adverse effects on the wetland had been minimized such that the road was exempt under MCL 324.30305(2)(j) from the wetland permit requirement.  The trial court further ordered Brotherton to obtain a wetland expert to address plaintiff's concerns about the road and, subsequently, ordered Brotherton to make culvert repairs as a remedial measure.  "This Court affords great deference to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *Sancrant*, 337 Mich App at 717 (quotation marks and citation omitted).  There is record evidence to support the trial court's findings and, after reviewing this record, we are not left with a definite and firm conviction that a mistake was made. *Id*. at 714.  Because the trial court's resolution of

the factual conflicts was not clearly erroneous, we affirm its ruling based on those factual findings with respect to the determination that the logging road was exempt from the permit requirement.

To the extent plaintiff argues that the forest road exemption's language requires adverse effects on the wetland to be reduced to the point that there are no adverse effects, this argument is unsupported by the plain language of the statute. The statute requires that "any adverse effect on the wetland will be minimized." MCL 324.30305(2)(j). The statute does not require that any adverse effects be *eliminated*. "If the statutory language is clear and unambiguous, then we conclude that the Legislature intended the meaning it clearly and unambiguously expressed, and the statute is enforced as written." *Gomez*, 318 Mich App at 12 (quotation marks and citation omitted).

In light of our conclusion, this Court need not decide whether the trial court erred in determining whether the logging road area was a wetland because even assuming that plaintiff is correct in characterizing the entire area as a wetland, the road was still exempt from the permit requirement pursuant to MCL 324.30305(2)(j).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full, no costs are awarded. MCR 7.219.

/s/ Stephen L. Borrello
/s/ Christopher P. Yates